24-2464-cv; 24-2761-cv
*Roth v. LAL Family Corp.; Roth v. Drahi*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2024

ARGUED: MARCH 6, 2025
DECIDED: MAY 23, 2025

-------------------------------------

No. 24-2464-cv

ANDREW E. ROTH, on behalf of THE ESTÉE LAUDER COMPANIES INC.,
*Plaintiff-Appellant,*

*v.*

LAL FAMILY CORPORATION, LAL FAMILY PARTNERS L.P.,
*Defendants-Appellees,*

THE ESTÉE LAUDER COMPANIES INC.,
*Nominal Defendant-Appellee.*

-------------------------------------

No. 24-2761-cv

ANDREW E. ROTH, on behalf of ALTICE USA, INC.,
*Plaintiff-Appellant,*

*v.*

PATRICK DRAHI, NEXT ALT S.À.R.L., BIDFAIR LUXEMBOURG S.À.R.L., ALTICE UK

S.à.r.l., UpperNext S.C.S.P.,
*Defendants-Appellees,*

Altice USA, Inc.,
*Nominal Defendant.* \*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

Before:        Jacobs, Calabresi, and Nathan, *Circuit Judges*.

These related appeals consider, and reject, a novel theory of liability for short-swing profits under Section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b). Section 16(b) requires corporate insiders to disgorge all profits realized from paired purchases and sales, within a six-month period, of any equity security of an issuer with which they have an insider relationship. Appellant Andrew Roth seeks to impose Section 16(b) liability by pairing sales by controlling shareholders with share repurchases by corporations they control; but because applicable state law transforms outstanding securities into treasury shares when repurchased by the issuer, these transactions are different in kind and cannot be paired. We therefore **AFFIRM** the judgments below dismissing Roth's complaints.

---

\* The Clerk of Court is respectfully directed to amend the official case captions as set forth above.

2

Judge Calabresi concurs in the judgment in a separate opinion.

> GLENN F. OSTRAGER, Ostrager Chong
> Flaherty & Broitman P.C., New York, NY
> (*with* Joshua S. Broitman and Roberto L.
> Gomez, Ostrager Chong Flaherty &
> Broitman P.C., New York, NY, *on the brief*),
> *for Plaintiff-Appellant.*

> ZACHARY D. TRIPP, Weil, Gotshal & Manges
> LLP, New York, NY (*with* Caroline H.
> Zalka, Adam B. Banks, and Shai Berman,
> Weil, Gotshal & Manges LLP, New York,
> NY, *on the brief*), *for Defendants-Appellees*
> *LAL Family Corporation and LAL Family*
> *Partners L.P.*

> JOSEPH E. FLOREN, Morgan, Lewis &
> Bockius LLP, San Francisco, CA (*with* Ari
> Micah Selman and Michael T. Paslavsky,
> Morgan, Lewis & Bockius LLP, New York,
> NY, *on the brief*), *for Defendants-Appellees*
> *Patrick Drahi, Next Alt S.à.r.l., Bidfair*
> *Luxembourg S.à.r.l., Altice UK S.à.r.l., and*
> *UpperNext S.C.S.p.*

DENNIS JACOBS, *Circuit Judge*:

These related appeals consider, and reject, a novel theory of liability for short-swing profits under Section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b). Section 16(b) requires corporate insiders to disgorge to any issuer with which they have an insider relationship all profits they realize from paired purchases and sales, within a six-month period, of any equity security of that issuer. Insiders are required under Section 16(a) to periodically disclose their transactions in their issuers' equity securities; and vigilant shareholders can scan these disclosures to match transactions for the purpose of enforcing Section 16(b). The pairing process is mechanical; the liability, strict; and the amount of recovery, arithmetic.

In these cases, Plaintiff-Appellant Andrew Roth attempts to pair sales of outstanding shares made by controlling shareholders with transactions in which controlled corporations repurchased shares that they had issued. But the identified transactions are different in kind because of the peculiar nature of shares repurchased by an issuer under Delaware law; and these differences make Section 16(b) impossible to apply, let alone to apply mechanically. The transactions therefore cannot be paired. The facts in these two cases are

4

parallel, and the legal theory advanced in them, identical. One is an appeal from a judgment of dismissal entered in the United States District Court for the Southern District of New York (Cronan, *J.*); the other is an appeal from a judgment of dismissal entered in the United States District Court for the Eastern District of New York (Irizarry, *J.*). Because both suits are premised on the same invalid legal theory, we **AFFIRM** both judgments.

## I.

The facts and transactions in the two cases are generally undisputed.

### a. Roth v. LAL Family Corp.

In the first case, Roth alleges that he is a shareholder of the Estée Lauder Companies Inc. ("Estée Lauder"), a Delaware corporation controlled by the Lauder family through the named defendants. The Lauders' LAL Family Corporation ("LALFC") is the sole general partner of LAL Family Partners L.P. ("LALFP"), which in turn controls Estée Lauder. Through LALFP and LALFC, the Lauders are beneficial owners of more than 10% of Estée Lauder's outstanding Class A common stock and have an "approximately 23% indirect pecuniary interest" in Estée Lauder. LAL App'x 7.

In November 2021, LALFP and LALFC reported to the SEC, pursuant to Section 16(a), that LALFP sold 2 million shares of Estée Lauder's Class A common stock at $342.23 per share. Estée Lauder, meanwhile, reported on different SEC forms (required under different Exchange Act sections) that it had repurchased Class A shares pursuant to a stock buyback program almost every month within the statutory window centered on LALFP's sale. Repurchased shares totaled nearly 7 million at prices per share ranging from $244.73 to $338.56. The repurchased shares were instantly and automatically converted into treasury shares by virtue of Delaware corporate law. *See In re Coffee Assocs.*, No. CIV A 12950, 1993 WL 512505, at *4 (Del. Ch. 1993); *In re Pub. Serv. Holding Corp.*, 24 A.2d 584, 586 (Del. 1942). This automatic process removed them from the pool of outstanding shares and divested them of any incidents of ownership, such as rights to vote or receive dividends. Roth alleges that 23% of these repurchases should be attributed to LALFP and LALFC, to match their pecuniary interest in Estée Lauder. If Roth could match these proportionally attributed shares with the shares that LALFP sold, LALFP and LALFC would owe $56,732,373.90 in short-swing profits to Estée Lauder.

6

After Roth's unsuccessful demand that Estée Lauder sue its controlling shareholders for disgorgement under Section 16(b), he filed suit on the corporation's behalf in the Southern District of New York. Judge Cronan granted LALFP and LALFC's motion to dismiss, holding that issuer repurchases cannot be paired with insiders' sales of outstanding shares to create Section 16(b) liability. *Roth v. LAL Family Corp.*, 748 F. Supp. 3d 180 (S.D.N.Y. 2024). Roth timely appealed.

### b.    Roth v. Drahi

In the second case on appeal, Roth alleges he owns common stock of Delaware corporation Altice USA, Inc. Defendant Patrick Drahi is an Altice director and, through his ownership or control over his co-defendants, Altice's controlling shareholder. Aggregating the shares owned by the various individual defendants, Drahi beneficially owned more than 10% of Altice's outstanding common stock and had an "approximately 49.6% indirect pecuniary interest" in the corporation. Drahi App'x 11. Drahi reported to the SEC that he sold nearly 4 million shares of Altice's common stock in May 2021 at $37.21 per share. Altice, meanwhile, reported repurchasing approximately 9.5 million shares of its own common stock at prices averaging from $30.42 and $33.81 per

share within the statutory window centered on Drahi's sales. Like Estée Lauder's repurchased shares, Altice's repurchased shares instantly and automatically became treasury shares at the moment of repurchase. If Roth could proportionally attribute these repurchased shares to Drahi and match them with the shares that Drahi sold, then Drahi would owe $17,384,613 in short-swing profits to Altice.

After Roth's unsuccessful demand that Altice sue Drahi for disgorgement, Roth filed suit on Altice's behalf in the Eastern District of New York, alleging Drahi violated Section 16(b) either on his own or in coordination with his co-defendants. Relying in part on Judge Cronan's analysis, Judge Irizzary dismissed this complaint. *Roth v. Drahi*, No. 23-cv-5522, 2024 WL 4198517 (E.D.N.Y. Sept. 16, 2024). Roth timely appealed this dismissal as well, and we heard the cases in tandem.[1]

---

[1] Two similar cases filed by Roth have likewise been dismissed. *See Roth v. Russell*, No. 23-cv-722, 2023 WL 6845502 (M.D. Fla. Oct. 17, 2023), *reconsideration denied*, 2024 WL 382602 (M.D. Fla. Feb. 1, 2024), *appeal docketed*, No. 24-10448 (11th Cir.); *Roth v. CK Amarillo LP*, No. 24-cv-706, 2025 WL 966793 (S.D.N.Y. Mar. 30, 2025), *appeal docketed*, No. 25-1084 (2d Cir.).

## II.

"We review *de novo* a district court's dismissal under Rule 12(b)(6)." *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).    These appeals ask whether an issuer's share repurchase is a purchase of "any equity security" that may be paired with an insider's personal sale of outstanding shares of the issuer, such that any "profit realized" by the insider is subject to disgorgement to the issuer. Where applicable law transforms outstanding securities into treasury shares upon repurchase by the issuer, we answer this question in the negative and so conclude that Section 16(b) does not impose liability for the alleged pairing.

"A vital component of the Exchange Act, § 16(b) was designed to prevent an issuer's directors, officers, and principal stockholders 'from engaging in speculative transactions on the basis of information not available to others.'" *Donoghue v. Bulldog Investors G.P.*, 696 F.3d 170, 173-74 (2d Cir. 2012) (quoting *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012)).    Section 16(b) advances this purpose by the harsh measure of strict liability.    *Id.* at 174; *see also Blau v. Lamb*, 363 F.2d 507, 515 (2d Cir. 1966) ("It might be said that Congress decided in order to throw out the bathwater that the baby had to go too.")    But "it is inappropriate to reach the harsh result of imposing § 16(b)'s liability

9

without fault on the basis of unclear language." *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 252 (1976). So, Congress created "narrowly drawn limits" on Section 16(b)'s scope. *Feder v. Frost*, 220 F.3d 29, 32 (2d Cir. 2000) (quotation marks omitted).

Ordinarily, identifying liability within these narrow limits is easy because of how two parts of Section 16 operate in tandem. Subsection (a) requires directors and officers of issuers of any equity security, as well as "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of any issuer, to file with the SEC a statement disclosing their interests in that issuer's equity securities under certain circumstances, including within two days of engaging in qualifying transactions. 15 U.S.C. § 78p(a); *see also Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) (Section 16 applies to "insiders"). Subsection (b) in turn imposes strict liability for short-swing profits resulting from the transactions that should be disclosed under subsection (a):

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and

10

be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer.

15 U.S.C. § 78p(b). Thus, Section 16(a) requires insiders to disclose their transactions in equity securities of an issuer with which they have insider status, and Section 16(b) holds insiders liable for pairable transactions in such equity securities made within six months. *See Gibbons*, 703 F.3d at 599-600. The required disclosures make pairing transactions "mechanical." *Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316, 318 (2d Cir. 1998). Occasionally, however, a theory of liability--like the one invoked here--tests Section 16(b)'s mechanical application.

## III.

Remember that Section 16(b) provides that "any profit realized" by an insider from his direct or indirect "purchase and sale" within a six-month period of "any equity security" of an issuer with which he has insider status shall "inure to and be recoverable by the issuer." 15 U.S.C. § 78p(b). We have, from time to time, listed the elements of Section 16(b) claim as: "(1) a purchase and (2) a sale of securities (3) by an insider (4) within a six-month period." *E.g.*, *Chechele v. Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky*, 156 F.3d at 308)

11

(alterations adopted)). Our precedents have identified two additional requirements in the text of Section 16(b). The first is that the pairable transactions must involve substantively identical equity securities. *See Gibbons*, 703 F.3d at 600. The second is realized profit. The "word 'realized' . . . connotes gain"; without gain, there is no liability. *S. & S. Realty Corp. v. Kleer-Vu Indus., Inc.*, 575 F.2d 1040, 1044 (2d Cir. 1978). The profit requirement is specific to the paired transactions; an insider's other market activity (which may involve losses) is irrelevant. *See Gwozdzinsky*, 156 F.3d at 308. Therefore, a Section 16(b) plaintiff must plead and prove that (1) an insider (2) has made a purchase and (3) a sale (4) within a six-month period (5) of substantively identical equity securities (6) and thereby realized a profit. Roth cannot discharge this burden.

When it comes to issuer repurchases, Section 16(b) precludes Roth's theory for (at least) five reasons. First, Section 16(b) requires defendants have beneficial ownership over the shares involved in each transaction in order for them to be considered insiders; but SEC regulations preclude attributing to controlling shareholders even indirect beneficial ownership of shares repurchased by issuers. Second, paired Section 16(b) transactions must involve substantively identical equity securities; but the equity securities personally sold

by an insider differ in important ways from the equity securities an issuer may repurchase. Third, these substantive differences preclude the realization of any profit. Fourth, and at the risk of stating the obvious, disgorgement to the issuer cannot be an equitable remedy for the issuer's own acts. Finally, the mismatches between Roth's theory and the text of Section 16(b) demonstrate that strict liability is inappropriate here.

We consider these problems with Roth's theory one by one.

### a. Beneficial Ownership

To begin with, defendants here were not insiders to the repurchases because they lacked beneficial ownership over the repurchased equity securities.

Roth acknowledges that the defendants here did not directly purchase any shares. Instead, Roth argues that the defendants engaged in purchases *in*directly when the corporations they control repurchased shares. But to attribute these transactions indirectly to the defendants, Section 16(b) requires the defendants to have become indirect beneficial owners of the repurchased shares. And contrary to what Roth claims, controlling shareholders do not become indirect beneficial owners of shares acquired by an issuer when that

issuer repurchases its own issue, because state law transforms those shares into treasury shares.

"The issue presented in this appeal is one of statutory interpretation, so we begin by examining the statutory text." *Gibbons*, 703 F.3d at 599. Section 16(b) imposes liability for "any" purchase and sale combination of a qualifying equity security from which a qualifying insider realizes a profit. 15 U.S.C. § 78p(b). The word "any" indicates that Section 16(b) imposes indirect liability for transactions to which an insider is not a party but from which an insider stands to benefit. But the clarity of Section 16(b)'s text ends there, at least regarding indirect liability.

To help determine which indirect interests fall under Section 16(b), we look to the SEC's regulations. Section 16(b) applies to transactions by directors, officers, and "beneficial owners"--a term that the statute leaves undefined. The SEC observed that this absence of a definition created "[u]ncertainty as to the status of indirect interests in securities of the issuer." *Feder*, 220 F.3d at 32 (quoting Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 34–26333, 53 Fed. Reg. 49997-02, 50001 (Dec. 13, 1988)). The SEC responded to this problem by defining "beneficial

14

ownership" twice over. *See id.* at 33-34 (discussing Rule 16a-1(a), 17 C.F.R.

§ 240.16a-1(a)); *cf. id.* at 35-36 (concluding "that the SEC had the authority to

promulgate Rule 16a-1(a)" because "[p]romulgating a definition of 'beneficial

owner' that includes statutory insiders who have an indirect pecuniary interest

in securities in no way undermines Section 16(b)'s objectives"). The first

definition determines which shareholders can be considered statutory insiders of

an issuer alongside directors and officers. *See* 17 C.F.R. § 240.16a-1(a)(1). The

applicability of this first definition to these defendants is not in dispute, so we

need not dwell on its complexity.

The second definition of "beneficial ownership" determines which

particular transactions may trigger the liability of any insider, whether director,

officer, or shareholder determined to be a beneficial owner under the first

definition. In this context, Rule 16a-1(a)(2) defines a "beneficial owner" as "any

person who, directly or indirectly, through any contract, arrangement,

understanding, relationship or otherwise, has or shares a direct or indirect

pecuniary interest in the equity securities" transacted. 17 C.F.R.

§ 240.16a-1(a)(2). A "pecuniary interest in any class of equity securities" is in

turn defined as "the opportunity, directly or indirectly, to profit or share in any

profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a-1(a)(2)(i). The regulations provide a non-exhaustive list of indirect pecuniary interests, none of which maps onto the facts alleged here. *See* 17 C.F.R. § 240.16a-1(a)(2)(ii). Even without additional guidance, however, we conclude that an insider lacks an indirect pecuniary interest in repurchased shares and is therefore not considered a beneficial owner of them.

In *Feder*, we acknowledged that "[s]ecurities owned by a corporation are assets affecting the value of that corporation's shares, and a shareholder does in that meaningful sense have at least an indirect pecuniary interest in portfolio securities." *Feder*, 220 F.3d at 34. But portfolio securities are "all securities owned by an entity, *other than securities issued by the entity*." 17 C.F.R. § 240.16a-1(g) (emphasis added). This limitation makes sense. Outstanding shares issued by one corporation and acquired by another show up on the balance sheet of the acquirer as assets similar to equipment or facilities--just as they would appear on a personal balance sheet if a shareholder purchased them personally. These shares may convey a right to vote or receive dividends, which the acquirer may exercise--and which a shareholder of the acquirer may indirectly exercise through his ownership interest in the acquirer. If the

16

acquirer resells these portfolio securities at a higher price, its shareholders will share in any increment in corporate assets.

Share repurchases operate differently. Under relevant state corporate law, shares repurchased by an issuer become treasury shares at the moment of repurchase. *See In re Coffee Assocs.*, 1993 WL 512505, at *4. No right of ownership passes to a repurchasing issuer. *See* 11 Fletcher Cyc. Corp. § 5080.80 (2023) ("[T]he corporation, although nominally the owner [of treasury shares], cannot exercise certain rights of ownership."). Treasury shares are, as a matter of law, valueless. *See E.R. Squibb & Sons v. Helvering*, 98 F.2d 69, 70-71 (2d Cir. 1938) (rejecting it as seemingly "impossible . . . to understand how the notion of a gain to the corporation from" share repurchases "is legally tenable, except when the sale of the shares is at a price higher than their real value at the time of the sale"). "A company is not worth more because it holds its own (treasury) stock[,] and it is not worth less if it gives out that stock for free." Christine J. Chen, Y. Carson Zhou, Tooley *Brooks No Exceptions--Equity Dilution Is Direct*, 26 U. PA. J. BUS. L. 1, 29 (2023). *Feder*, upon which Roth so heavily relies, applied Section 16(b) liability only to where the transacted securities "*affect[ed] the value*" of the holding corporation. 220 F.3d at 34 (emphasis added).

17

The conversion from outstanding share to treasury share upon repurchase is immediate and automatic, if also a stroke of legal fiction.    For our purposes, it suffices that the "subject securities" of an issuer's repurchase *are* treasury shares, regardless of the means by which they become so.    Because a transaction in these "subject securities" renders those shares valueless, no one has an opportunity to profit from any such transaction.    Without an opportunity to profit, there is no pecuniary interest; without a pecuniary interest, there is no beneficial ownership; and without beneficial ownership, there is no liability.

### b.    Pairing

Roth also cannot establish that the equity securities transacted in each allegedly pairable transaction were substantively identical.

Section 16(b) requires paired transactions in "any equity security."    15 U.S.C. § 78p(b).    But transactions in "readily distinguishable" stocks cannot be paired because they are not trades in "*any* equity security," a term of art that Congress intentionally made singular.    *Gibbons*, 703 F.3d at 601 ("Congress's use of the singular term 'any equity security' supports an inference that transactions involving *different* equity securities cannot be paired under § 16(b).").    Lest Section 16(b) be defeated by formalism, it captures profit realized from trading in

18

issues that are differently named yet "essentially indistinguishable." *Id.* What matters is whether securities are substantively identical in that they are "economically equivalent," however they may be denominated. *Id.* at 602. This clarification is of no help to Roth because the allegedly pairable securities here are readily distinguishable.

Where insiders purchase outstanding shares from other private participants in the market, incidents of ownership survive in the hands of these new shareholders. The same is true where an insider is the seller rather than the buyer of an investor-to-investor, open-market transaction. By contrast, the law works to deprive shares repurchased by an issuer of any incidents of ownership. Shares that remain outstanding after an investor-to-investor transaction therefore differ in substance from treasury shares that are repurchased. *See id.* at 601-02 (where one share "confer[s] voting rights" on the purchaser but another does not, "[t]he two securities . . . are distinct . . . in substance"). Because substance is what matters here, the transactions are not in "*any* equity security" and cannot be paired.

Roth discounts the substance of the equity securities to argue that share repurchases have "the same economic effect" as purchases of outstanding shares

19

by new, private shareholders. *See* LAL App'x 12. Not so. When outstanding shares are exchanged between private hands, they stay in circulation; the shares' incidents of ownership pass into new hands but are otherwise unchanged. By contrast, when issuers repurchase outstanding shares, resultant treasury shares are removed from circulation. This effects a *pro rata* change to the ownership interest of each remaining outstanding share of the issuer, so that all remaining shareholders benefit (or not) alike. *Cf. Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 126-27 (2d Cir. 2002) (no liability "when all stockholders are treated the same (*i.e.,* via *pro rata* rights and public information)" (internal citation omitted)). Not only does the substance of these transactions differ, but so too does the economic effect.

Aha, Roth might say, but we are wrong to consider the repurchased shares to be treasury shares at all: the securities here were substantively identical *before* the alleged transactions, when they were all in the hands of private shareholders. And indeed, the Exchange Act "defines 'purchases' . . . broadly" to include "any contract to buy, purchase, or otherwise acquire." *Huppe*, 670 F.3d at 218 (quoting 15 U.S.C. § 78c(a)(13)); *see also LAL Family*, 748 F. Supp. 3d at 189 (reviewing "[c]ontemporary dictionaries from the time of the passage of the

20

Exchange Act" to define "purchase" as requiring "the purchaser obtain some kind of interest in the property being transacted").   But a share purchase must still be made before it can be paired with a share sale, for no profit can be realized unless a property interest changes hands.   So, until an alleged purchaser obtains an interest in property, there is no purchase.   *Cf. Magma Power*, 136 F.3d at 321-22 ("triggering event" for Section 16(b) occurs when an insider becomes "bound by the terms" of the transaction).

It matters, then, that at the moment an issuer's interest in repurchased shares materializes, the repurchased shares are treated in law as treasury shares. An issuer cannot acquire as an asset an outstanding share that it once issued because that would amount to an obligor having ownership of an obligation in itself.   *See* 3 Treatise on the Law of Corporations § 21:9 (4th).   Which is to say that an issuer cannot, as a matter of law, purchase "any equity security" substantively identical to the shares an insider may sell when they originate in that issuer.   And since the insiders under Roth's theory can be said to purchase equity securities only by indirectly attributing to them an issuer's repurchase, this also means that insiders have not engaged in pairable transactions. Without pairable transactions, there is no liability.

21

### c.    Profit

Nor can Roth establish that there is "profit realized" from the nonpairable transactions alleged here.

Finding realized profit is, like the rest of a Section 16(b) case, normally mechanical.    "[P]rofit connotes an excess of returns over expenditures in a transaction or series of transactions: as . . . the excess of the price received over the price paid for goods sold."    *S. & S. Realty*, 575 F.2d at 1043-44 (internal quotation omitted).    It is easy to count the profit realized from buying low and selling high.    Such profits are "realized" when transactions result in a surplus of "a tangible asset or a fund"--ordinarily cash.    *See id.* at 1044.    When the same equity security is bought and sold within the statutory window, any resulting excess becomes "recoverable" by the issuer.[2]

---

[2]  We have held that under the SEC's Section 16(b) regulations, realized profit may also include "increases in the value of shares of a corporation dealing in *portfolio* securities" due to a shareholder's indirect interest in portfolio securities. *Feder*, 220 F.3d at 36 (discussing Rule 16a-1(a)(2), 17 C.F.R. § 240.16a-1(a)(2)) (emphasis added).    Even under this "slightly expansive reading" of Section 16(b), *id.*, however, Section 16(b) does not encompass Roth's theory of liability. As explained above, the treasury shares at issue here are categorically different from portfolio securities under Delaware law.

What profit does an insider realize under Roth's theory? Roth's theory does not involve offsetting transactions in substantively identical equity securities. Because the shares in each transaction are distinguishable, an insider sued under Roth's theory lacks an expenditure to subtract from any return. Without such a cost basis, there is no excess; and without an excess, there is nothing to disgorge; without anything to disgorge, there is again no liability. No beneficial ownership, no pairable transactions, no realized profit: Section 16(b) precludes Roth's theory at every turn.

### d. Disgorgement

Consider further how Roth's theory, if valid, would play out in litigation. The sole remedy under Section 16(b) is disgorgement *to the issuer*. But if Roth's theory were valid, issuers could pursue claims against their insiders based on the issuers' *own conduct*. Section 16(b)'s equitable remedy is not designed to produce the inequitable result that Roth imagines.

The SEC recognized this potential anomaly long ago. The SEC once advised expressly that "[i]ssuer repurchases are exempt from the application of Sections 16(a) and 16(b)" because "[i]mposition of the short-swing profit recovery provisions of Section 16(b) would be incongruous [where] the company

23

would owe any profit to itself." *Interpretive Release on Rules Applicable to Insider Reporting & Trading*, Exchange Act Release No. 34-18114, 46 Fed. Reg. 48147-01, 48156 & n.59 (Oct. 1, 1981). For this reason, SEC regulations for years exempted "[s]ecurities reacquired by or for the account of an issuer and held by it for its account" from the reach of Sections 16(a) and 16(b). *See* 17 C.F.R. § 240.16a-4(d) (1948); 17 C.F.R. § 240.16a-4(c) (1965). The SEC later determined this decades-old express exemption was "unnecessary" because "the issuer is not subject to Section 16." *Ownership Reports & Trading by Officers, Dirs. & Principal Sec. Holders*, Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242-01, 7261 (Feb. 21, 1991). These regulations have been deleted, and the explanation for deletion may be old, but the SEC has not revisited its position on this issue. Nor has the SEC or the courts concluded that Section 16(b) reaches an issuer's transactions in its own issue.

Most important, however, is that the SEC's position is sound for all the reasons stated herein. We agree with the SEC that Section 16(b) does not apply where disgorgement is "incongruous" with the alleged conduct. Section 16(b) liability is already "arbitrary, some might say Draconian," enough based on the statute's plain text. *See Blau*, 363 F.2d at 515. We therefore reject Roth's

24

attempt to impose liability where neither Section 16(b)'s text nor any available guidance would have warned insiders--or their lawyers--that strict liability might apply.

### e.    Strict Liability

Finally, Roth's theory would bring about other surprising ramifications. There are insiders, and there are *insiders*; and not all will possess inside information about share repurchases.   *Cf. Gwozdzinsky*, 156 F.3d at 309 (Section 16(b) was designed to prevent insiders from profiting "by virtue of . . . inside information").   Section 16(b)'s strict liability obviates the need to prove knowledge of inside information, let alone intent to abuse it.   *See Blau*, 363 F.2d at 515 ("Congress explicitly made irrelevant the intent of any insider who engages in a short-term transaction.").   So, since there are insiders without knowledge of stock repurchases, Roth would make Section 16(b) a trap sprung with every transaction.   This harsh result cannot be what Congress intended.[3]

---

[3] Roth's theory also implicates Section 16(a).   Were he correct, then every insider should report every share repurchase.   Share repurchases are now a trillion-dollar practice yearly; yet, insiders have never disclosed them.   If every insider has failed to comply with Section 16, it is odd that until now no one has noticed.

Roth argues that the Supreme Court's *Kern County* decision requires us to consider whether insiders may use treasury share repurchases "as a vehicle for the evil which Congress sought to prevent," and if so, to interpret Section 16(b) to encompass these transactions despite all the indications to the contrary. *See Kern County Land Co. v. Occidental Petrol. Corp.*, 411 U.S. 582, 594 (1973). Roth's expansive reading of this case is foreclosed by precedent that reads it narrowly. To prevent policy from displacing statutory text, we have explained that *Kern County* creates an exception that "only applies when the transaction at issue is 'an [1] involuntary transaction by an insider [2] having no access to inside information.'" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 45 (2d Cir. 2012) (quoting *Huppe*, 670 F.3d at 218-19)). *Kern County* itself warns that courts should "implement congressional objectives without extending the reach of the statute beyond its intended limits." *Kern County*, 411 U.S. at 594-95.

To extend the reach of Section 16(b) in the direction that he wishes it to go, Roth points us to the work of Professor Jesse M. Fried, who observes that "insiders have a strong incentive" to "engage in indirect insider trading [by] having the firm buy and sell its own shares at favorable prices to increase the value of the insiders' equity." Jesse M. Fried, *Insider Trading via the Corporation*,

26

162 U. Pa. L. Rev. 801, 804 (2014). Notwithstanding that incentive, Professor Fried concludes that "Section 16(b) *does not apply* to indirect purchases made by insiders through share repurchases," *id.* at 830 (emphasis added), and will not do so absent action by Congress. We agree. As currently written, and as long understood, Section 16(b) does not impose liability on insiders for an issuer's transactions in its own issue. We reject Roth's "attempt to bring this transaction within the ambit of Section 16 by invoking [a] policy argument" to the contrary. *See Gwozdzinsky*, 156 F.3d at 310.

The complaints seek to pair the nonpairable. Roth therefore failed to state claims on which relief can be granted, and we accordingly **AFFIRM** the judgments of dismissal.